[L. A. No. 3054.   In Bank.—February 4, 1914.]

KATE BROWN and ETHEL BROWN, Appellants, v. PA-
CIFIC ELECTRIC RAILWAY COMPANY (a Corpo-
ration), Respondent.

Negligence — Collision With Electric Street-car — Contributory Negligence—Running in Front of Rapidly Approaching Car—Nonsuit.—In an action to recover damages for the death of a man caused by a collision with an electric railway car at a street crossing in a city, a nonsuit is properly granted, if it appears from the plaintiff's evidence that the deceased, after approaching the car-track and seeing the rapidly approaching car with its brilliant headlight, and after turning back to a place of safety, and hearing the warning whistle sounded by the motorman, suddenly, without looking, or taking any of the commonest precautions, rushed in front of the car.

Id.—Excessive Speed of Car—Knowledge of Speed.—The mere fact that the speed of the car at the time of the accident was in excess of that allowed by a city ordinance did not prevent the granting of the nonsuit, if it appeared from the plaintiff's evidence that it was customary for the defendant to run its cars at that rate of speed at the place of the accident, that such practice was known to the

deceased, and the high rate of speed of the car was apparent to any observer.

ID.—CONTRIBUTORY NEGLIGENCE QUESTION FOR COURT.—While ordinarily the question of contributory negligence must be left to the jury, such facts present a case where "the standard of conduct required of persons under given circumstances is so obvious as to be applicable to all persons under such circumstances."

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. George E. Church, Judge presiding.

The facts are stated in the opinion of the court.

Charles Lantz, W. J. Wood, and Sperry Baker, for Appellants.

J. W. McKinley, R. C. Gortner, and W. R. Millar, for Respondent.

MELVIN, J.—Plaintiffs, who were the wife and daughter of John W. Brown, sued to recover damages for his death which was caused by one of defendant's electric cars operated over a line of railway extending from Los Angeles to Long Beach. After the introduction of all the evidence on behalf of plaintiffs the defendant moved for a nonsuit. The motion was granted and judgment was entered accordingly. From this judgment and from an order denying their motion for a new trial plaintiffs appeal.

John W. Brown was killed by a car of the defendant corporation at the crossing of the latter's tracks with Vernon Avenue in the city of Los Angeles. At that place four tracks are used by the defendant. Upon the two inside tracks are operated the through cars that pass between Los Angeles and Long Beach. The local cars are run upon the outside tracks. Mr. Brown, who resided east of the intersection of defendant's tracks with Vernon Avenue, was returning to his home from Los Angeles. He had traveled upon a southbound local car and had alighted at Vernon Avenue at a point west of defendant's tracks. Another passenger, Mr. Adelbert Campbell, got off the local train at approximately the same place. Both passengers resided east of the tracks and would

necessarily cross said tracks in going to their homes.  After the local car which had carried them to that point had proceeded on its way, Mr. Brown started to cross the tracks. The night was partly cloudy but there was no fog and no moon.  It was stipulated at the trial that the tracks north of Vernon Avenue were straight for at least a mile.  The said tracks are six or seven feet apart.  At the moment Mr. Brown started to cross the tracks, a southbound through car with a bright headlight was seen by Mr. Campbell approaching at a rapid rate on the track just east of the one on which the car that had brought him from down town had passed, that is, on the second track that he would traverse in going toward his home.  The story of what followed may best be told in the language of the witnesses.  Witness Campbell testified on direct examination in part as follows: "I saw Mr. Brown when he started to cross the track.  I also saw the car coming from the north about that time.  The Long Beach car coming from the north appeared to me to be at about the crossing known as Forty-second Street, at that time.  At that time they had that crossing numbered Forty-second Street.  It is now numbered Fortieth Street.  I have measured the distance from Fortieth Street down to Vernon Avenue.  It was about seven or eight poles; they are one hundred feet apart.  I measured it with a tape line.  I don't remember the number of feet; but 796 feet sounds like the right number.  The headlight on that Long Beach car was shining brightly.  It threw a light on Brown and myself. . . . While we were standing there, Mr. Brown started to cross the track.  He got over on the second track, about the middle of the second track, the through track; then he faced the car going south—that is, he faced up toward the car; then he turned around, and started back toward me a few feet, and then he appeared to turn around and right down the track in the path of the car. . . . Q. Well, did you notice his appearance there?  A. His appearance was apparently normal; I did not notice anything wrong with him."  Upon cross-examination he said, among other things: "When the Watts car had proceeded, we saw the southbound Long Beach car coming on track No. 2.  It was about 800 feet away when I first noticed it.  Just after the Watts car had gone, Mr. Brown started to cross Vernon Avenue.  Mr. Brown walked out until he got some-

where in the vicinity of the through track No. 2, and at that time looked toward the approaching car. He just looked at the car for about an instant, and then turned back toward me. Mr. Brown had gone on an angle toward the middle of the street, first going toward the track, and when he turned and came toward me, I do not know just how far he got, as I was watching the car. Then Mr. Brown turned back onto the track again. I think he made a sort of circle and came, something like the dotted line on the sketch, toward the track again (No. 2), and his back was partly toward the approaching car, he hurrying up a little bit. Mr. Brown was hit by the car when he got back on the track, but on a line with where I was standing. At that time he was hurrying. I do not know whether I shouted to him or not, as I was excited. I did not see any other car except the car that killed Mr. Brown and the Watts car that we had alighted from. I live on the east side of the track myself, but I did not try to cross. Mr. Brown's course is about as shown by the dotted line on the sketch, from the time he left me until he was struck.'' The dotted line on the sketch indicates that Mr. Brown moved first in a direction somewhat north of east. This would naturally turn his face partly toward the oncoming car which was southbound on the second track. In this direction he moved until he reached the westerly side of the track, then, according to the dotted line, he turned and walked in a southwesterly direction a few feet to a point three or four feet to the west of the track. While moving that short distance his back would be partly turned toward the approaching car. Then his course changed to a southeasterly one and for the first time he stepped upon the track where he was struck by the car. In the last movement he made before walking upon the track his back was partly turned toward the north from which direction all cars upon that track would run. Andrew Johnson, the motorman of the car that killed Mr. Brown, testified: ''I saw the two men standing together along the right hand side of the track, the west side of the track; then I saw Brown start across the track. He was running slowly. He was going in a way to indicate that he was dodging, trying to dodge; not parallel with the track and not straight across—just trying to dodge, kind of sideways, and turning down somewhat in the Long

Beach direction. When we go along I very often see people standing along the track. I saw Mr. Brown standing there; but whether he made that movement or not, I might have seen him make the movement and I can't recall it, but I saw him. When I saw the two standing there, and as we went near, I gave two quick blasts of my whistle, sort of called their attention to the fact that a train was coming. It is a habit I have, and do it all the time. And when I was still bearing down on the crossing, when I was within about a car length of the crossing, I saw him again, very plainly, because he started to run across the track. We were about a car length from the crossing at the time he started to run. I was the motorman on the car going toward Long Beach, going south, the motorman on the car that struck Mr. Brown. I only saw him plainly when he started to make his second run across; I didn't see him make his first move; I didn't notice it. They were in plain sight all the time. . . . When the car was within about a car or car length, or probably a car length and a half, from the Vernon Avenue crossing, Mr. Brown ran toward the track. He was running toward the track the car was coming on—not straight toward it, but kind of like dodging; and although the headlight was very strong at that distance, and the whistle was blown, he didn't even turn his face toward the car. He kept looking in the direction he was going, or running, rather, and he only got far enough to get the near corner of the car; he barely managed to get to the near corner of the fender.'' Mr. Campbell estimated the speed of the approaching car at thirty-five miles an hour, and there seems to be no doubt that it was going at a rate of speed far in excess of eight miles an hour, the maximum rate permitted by ordinance at that crossing. It was shown by the testimony of the witnesses for plaintiff, however, that the car was moving at the usual rate of speed maintained by through cars passing that crossing. It was also proven that Mr. Brown had lived for two or three months in that neighborhood and, as Mr. Page, manager of the store in which he was employed, said: ''Mr. Brown was accustomed to come up to town every day on the cars. I don't know how he got to town. He got up every day.'' While there was no direct evidence that he used this particular car line in going from and returning to his

home, it is highly probable, from its convenient situation, that he did so.

Appellants contend that, the question of contributory negligence being one for the jury unless the evidence shows without contradiction that the accident was due solely to the negligence of the person who was killed, the court erred in granting the nonsuit, because, added to the fact that defendant's car was running at an unlawful rate of speed, there was evidence that Mr. Brown was in the sight of the motorman long before he tried to cross the track, and that the jury should have been permitted to pass upon the question of "last clear chance." In this behalf counsel cite such cases as *Schneider* v. *Market St. Ry. Co.*, 134 Cal. 482, [66 Pac. 734]; *Bresee* v. *Los Angeles Traction Co.*, 149 Cal. 137, [5 L. R. A. (N. S.) 1059, 85 Pac. 152]; *Hoff* v. *Los Angeles Pac. Co.*, 158 Cal. 601, [112 Pac. 53]; *Lawyer* v. *Los Angeles Pac. Co.*, 161 Cal. 54, [118 Pac. 23]. But we think that these and many others cited present widely different facts from those disclosed by the evidence in the case at bar. All of those cases dealt with conditions involving the exercise of judgment in going upon the tracks in advance of approaching cars or trains, and it was held in each case that the jury should be allowed to determine whether or not the mistaken idea of the person injured or killed that he could reach a place of safety by acting as he did amounted to negligence so contributing to his injury or death as to preclude the recovery of damages from the railway company. Here, however, Mr. Brown after approaching the track and seeing the oncoming car with its brilliant headlight, and after turning back to a place of safety, and hearing the warning whistle, suddenly, without looking, without taking any of the commonest precautions, rushed in front of the car. The mere fact that the speed of the car was in excess of that allowed by the ordinance did not raise an insuperable barrier to the court's action in granting the nonsuit. Plaintiffs themselves proved the long continued practice of running the "through" cars at that rate of speed. Mr. Brown, a resident of that neighborhood, must have known of the practice. The high speed of the car was apparent to any observer, and this, taken in connection with the knowledge possessed by Mr. Brown of the speed usually maintained at that place, was sufficient to put him on his guard. There was

no statement from any witness that the motorman applied the brakes, but the inference to be drawn from the facts that the car was stopped at a distance of about two hundred feet below the crossing and that it was traveling at the rate of about thirty-five miles an hour when Mr. Brown started to run across the track, is most powerfully in favor of a conclusion that there must have been prompt action on the part of the motorman.

While it is true that ordinarily the question of contributory negligence must be left to the jury, we think that this is one of the cases where "the standard of conduct required of persons under given circumstances is so obvious as to be applicable to all persons under such circumstances." (*Hamlin* v. *Pacific Electric Co.*, 150 Cal. 779, [89 Pac. 1109].) If Mr. Brown had taken the commonest precautions the accident would not have occurred, and we cannot say that the court erred in granting the nonsuit and in entering judgment for the defendant.

The judgment and order are affirmed.

Henshaw, J., Lorigan, J., Shaw, J., Angellotti, J., and Sloss, J., concurred.