[Civ. No. 3394. Third Appellate District.—February 8, 1928.]

R. FLOYD PHILLIPS, Appellant, v. PACIFIC ELEC-
TRIC RAILWAY CO. (a Corporation), Respondent.

Ford, Bodkin, Watt & Herlihy, Henry G. Bodkin and H. L. Watt for Appellant.

Frank Karr, E. E. Morris and C. W. Cornell for Respondent.

THOMPSON (R. L.), J., *pro tem.*—This is an appeal from a judgment of nonsuit granted solely upon the ground

of alleged contributory negligence on the part of appellant, in an action for damages for personal injuries sustained in being run over by an electric car while attempting to cross respondent's tracks at the city of Venice.

The respondent railroad corporation owns and operates double tracks of electric trolley car lines adjacent to and parallel with the ocean shore from Santa Monica southerly through and beyond Venice. In the vicinity of Venice, where the accident occurred, the trolley right of way is about sixty feet in width, and at this point contains three lines of tracks, the rails of which are spiked to ties which rest upon loose ocean shore sand which is common in this vicinity. The rails extend above the ties a distance of about three inches. The main north and south bound tracks are some sixteen feet apart at this point. Along the extreme easterly portion of this right of way a third track has been maintained for more than ten years as a side-track, upon which it was the custom of respondent railroad company to station cars during the night, and at times when the traffic did not demand their immediate use. Appellant was aware of this custom. Parallel with this line of side-tracks, and three feet easterly thereof, was a sidewalk which was commonly used by pedestrians. This district was somewhat thickly settled, and was laid out in streets and blocks, with business buildings and dwelling-houses adjacent to the car line on either side. Clubhouse Avenue extended from the ocean on the westerly side of the tracks, at right angles to the trolley way, opposite which there was no regular paved or planked crossing of the tracks. Here there was a break in the continuation of this avenue, which resumed its course beyond the tracks about a hundred feet northerly. Between the main tracks at a point about a hundred feet southerly from the westerly extension of Clubhouse Avenue was a railway station where the electric trains customarily stopped for the accommodation of passengers. The railway right of way was not paved or planked for pedestrians at this crossing.

Appellant was thirty years of age, active, alert, and possessing good faculties. For fifteen years he had resided on Clubhouse Avenue west of the railroad tracks. In returning home from Venice, it was his custom to follow the sidewalk along the easterly side of respondent's right of

way to a point opposite the westerly entrance to Clubhouse Avenue, and then cross the tracks at right angles to his residence. At night the right of way was poorly lighted in this vicinity. There were no lights nearer than ten feet south of the waiting station. These lights consisted of three or four forty-watt electric lamps. No fence or obstructions existed to prevent pedestrians from crossing the tracks opposite Clubhouse Avenue. It was a common occurrence for people to cross the tracks at this point, although it was not a regular railroad crossing. The witness Mr. Heffron testified: "The public came to that station from Westminster avenue and also from Clubhouse avenue, and they crossed the tracks (there)." Mr. Wilson also testified: "There is a little crossing unkept, that leads across Horizon and Clubhouse, right across the tracks. . . . "

It appears from the evidence that, on the night of the accident the appellant had spent the evening with some friends south of Venice. About 11 o'clock P. M. he left for home, stopping for lunch at Venice. In company with a friend, he then pursued his course along the sidewalk easterly of respondent's trolley way, to a point immediately opposite Clubhouse Avenue where he resided. Here they stopped to chat for a moment. As they stood talking, appellant saw a car apparently stationed on the side-track about ninety feet northerly from the place where they stood talking. The car had neither headlight nor sidelights exhibited, although there was a dim light shining inside the car. No motorman was seen. There was nothing in the appearance of the car to indicate that it was in motion or approaching. Knowing of the custom to side-track cars at this point, seeing no lights and hearing no sounds to indicate that the car was in motion, the appellant was deceived into believing that it was in fact parked there for the night. Just before stepping upon the side-track to cross to his own side of the trolley way, he again looked to the north seeing the car in the same position which he supposed it formerly occupied. He then looked down toward the rails and stepped upon the track in an effort to cross the right of way. Suddenly, as he reached a point within a foot of the farthest rail of the side-track, he heard the rumbling of the wheels of the approaching car. It carried no headlight, nor sidelights, the fender was elevated,

and not down in its proper position for safety; no whistle was blown, and no gong was sounded. Startled, the appellant hesitated for a moment, then he lurched forward to save himself, but was struck and dragged some forty feet. One ankle was run over and crushed, necessitating the amputation of his foot. Four witnesses, besides the appellant, agree that neither headlight nor sidelights were lighted upon the car; that the fender was elevated, and that there was no one in or about the cars except a motorman who had charge of the car. Several witnesses testified they heard no whistle or bell. Evidently the car was without passengers, and was being run down to the main track by a single motorman, without lights or any of the usual evidences that it was in transit.

The appellant testified: "On the night of February 8th, . . . I was with some friends about eight blocks south of Venice. . . . I left there about 11:15 (P. M.). . . . I went up to Venice, and after getting something to eat, I started home on the sidewalk. . . . I proceeded along this walk until I came to Clubhouse avenue. . . . I am familiar with the place marked 'waiting-room.' I have been catching trains . . . for fifteen years at that station. . . . The trains stopped at that point. The waiting-room is opposite the alley marked on the map, and south of Clubhouse avenue (about a hundred feet) between the two main tracks. . . . The public crossed the south-bound track going to the waiting-room at Clubhouse avenue. That is the only way you can get to the station. The public also crossed from the east side of the main track going to the waiting-room. . . . For about ten years . . . the side-track has been used for parking electric trains—usually in the evening. I had observed cars there hundreds of times, for the night. They were parked on the side-track. . . . I arrived near Clubhouse avenue on the cement sidewalk about five or ten minutes after twelve. The chap with me, and I were walking down the sidewalk toward Clubhouse avenue, and we stood there a minute, and I happened to see this car parked there. . . . It was north of me. There was no headlight on it. There was a dim light inside. I couldn't say whether it was a single car or not. . . . There were no red lights nor green lights attached to it—no lights whatever. . . . I couldn't tell whether there was any man at the motor, or

not. . . . No gong or whistle was sounded immediately prior to the time I was struck by the car. . . . I did not become aware that the car was moving toward me until, I should judge, it was about eight feet from me, and at that time (when) I heard (it),—I gave a lurch, and that is the last I remember,—I was struck. I was about half way between the two rails on this switch-back when I was struck. . . . I was proceeding west toward the ocean . . . directly opposite the east side of Clubhouse avenue. . . . The only way people could get there (to the station) was walking on that sidewalk. They proceeded west to Clubhouse avenue and across. . . . When this car was right on top of me, I naturally tried to get out of the way of it. I jumped westerly— that was the direction I was going; then it hit me. . . . My foot was crushed at the ankle, but not cut off completely, but I had to have it amputated. . . . No warning was given from the time I first saw the car until I was struck. There were no . . . lights there at the scene of the accident. . . . '' Upon cross-examination appellant further testified: ''I was directly opposite Clubhouse avenue on the sidewalk when I saw the car that I thought was standing still . . . I should judge the car was (then) about half a block away, in the neighborhood of ninety or a hundred feet. . . . I was standing on the sidewalk at the time talking with this chap. I stood there, I imagine about a minute or so talking, after I saw the car. As I stood upon the sidewalk, I looked again. When I stepped off the sidewalk, the car was in the same position I noticed it at first,—somewhere ninety or a hundred feet away. I looked, and the car was standing there. . . . I had to look down to step over the tracks. . . . As I got to the second rail I heard the car coming. I looked up and then it was right on top of me. Then it kind of startled me, and I paused a moment, and then gave a lurch. The car was still up there when I stepped off the sidewalk to the rail. . . . It was very dark that night,—no lights, and I could not say exactly (where the car was located). . . . Just as I was about to step over the second rail, I heard the rumble of the train, and it looked like it was almost on top of me. . . . I stood there (on the sidewalk) about a minute talking to this friend. I looked before I stepped. I looked as I was stepping, and then (stepped) in the middle of the rails.''

The record discloses an abundance of evidence requiring the submission of the case to the jury for its consideration upon the issue of contributory negligence. The motion for nonsuit was therefore erroneously granted.

Contributory negligence will bar one from recovering damages for personal injuries. (Civ. Code, sec. 1714.) But the question as to whether one has brought the injury upon himself by a lack of ordinary care, is usually not a question of law for the court, but is one of fact for the jury. It is the province of the jury to determine the question of contributory negligence whenever the facts present a problem upon the solution of which reasonable minds may differ. (1 Thompson on Negligence, p. 408, sec. 425; 29 Cyc. 631; *Kelly* v. *Santa Barbara R. R. Co.*, 171 Cal. 423 [153 Pac. 903]; *Hoffman* v. *Southern Pacific Co.*, 84 Cal. App. 337 [258 Pac. 397].) For the purpose of a nonsuit the evidence must be viewed most strongly against the defendant. Every reasonable inference and presumption which may be deduced from the evidence must be resolved in favor of the plaintiff. All of the evidence disclosed by the record must be accepted as true. Conflicts and contradictions in the evidence must be disregarded. A lack of credibility of witnesses may not be considered, and the plaintiff's evidence is entitled to its full probative strength regardless of whether it may have been properly or improperly admitted. (9 Cal. Jur., p. 551, sec. 35.)

Since Trolley Way, at the point where the accident occurred, is unpaved, and occupied by double interurban tracks, consisting of ties which rest upon loose sand, and "T" rails projecting their full height above the level of the street, it must be conceded that the rule of caution required of a pedestrian attempting to cross tracks under such circumstances is the one applicable to steam railways, rather than the rule governing street-car tracks within the boundaries of a city congested with traffic. (*Riney* v. *Pacific Electric Ry. Co.*, 45 Cal. App. 145 [187 Pac. 50].) Clearly, this rule requires one to reasonably exercise his faculties of sight and hearing before attempting to cross an interurban electric system of tracks. One is bound to look and listen before crossing a railroad track, and if the view is obscured for any reason so as to impair his sight or hearing, the exercise of reasonable caution will require him to stop

so that he may more carefully look for approaching cars. (22 Cal. Jur., p. 318, sec. 68, p. 335, sec. 80; *Green* v. *Los Angeles Terminal Ry. Co.*, 143 Cal. 31 [101 Am. St. Rep. 68, 76 Pac. 719].)

 Testing the conduct of appellant in the instant case by the foregoing rule, can it be said that he omitted any act for his safety which would be required of a reasonable person under like circumstances? His familiarity with the custom of the respondent railroad company to station cars for the night on this side-track would induce him to reasonably conclude that here was a car switched out and stationed until the increased traffic in the morning would require its use. His very knowledge of this custom beguiled him into the natural mistake of assuming that it was sidetracked for the night. This inference may reasonably be supported by the fact that it appeared to be stationary, and had neither headlight nor sidelights which were customarily used upon these electric cars when they were being operated. He saw no motorman in the car, despite the dim light which appeared within. He heard no sound to warn him of a moving car, although his hearing was good. He stopped; he looked and observed the car, and he listened. It was dark at this point, for there were no lights nearer than the farthest end of the station, and these consisted of merely a group of three or four small incandescent globes. After stopping and observing the car some ninety feet away, he chatted for a moment or more with his friend, and before venturing upon the side-track, he again looked and saw the car in the same position where he supposed he had formerly seen it. Everything in the appearance of the car confirmed his belief that it was stationary. As a reasonable person he had a right to assume that it would not be run down across an open way leading to a residence street where the public were accustomed to cross the tracks, without a headlight and without adequate warning of whistle or bell. This is not a case of a pedestrian thoughtlessly stepping in front of a rapidly approaching car on a main line, where one should expect trains to be running, and where a glaring headlight, or a warning whistle or bell admonished him of the danger.

It was a mistaken estimate regarding an unlighted and unheralded car silently sliding down upon him on a side-

track in the darkness. His attention was diverted from the car as he looked downward in the darkness to pick his way across the track. Without warning the car suddenly came upon him. Unquestionably he was deceived regarding the real distance of the car when he saw it. The darkness and the lack of lights on the car may reasonably have accounted for this mistake. Since his hearing was good, we may reasonably assume that the car was silently rolling down upon him in the darkness without lights and without warning.

Under such circumstances, viewing the evidence most strongly against the respondent, with every reasonable inference and presumption in favor of the appellant; accepting the entire evidence as true; rejecting all conflicts and contradictions, if any exist, and giving full weight, credit and probative force to the testimony, we are bound to conclude that the record does not warrant the court in finding, as a matter of law, that appellant was guilty of contributory negligence.

As precedents in support of the judgment of nonsuit in the present case, respondent relies on the cases of *Brown* v. *Pacific Electric Co.*, 167 Cal. 199 [138 Pac. 1005] , *Ross* v. *Pacific Electric Co.*, 39 Cal. App. 659 [179 Pac. 538], and *Riney* v. *Pacific Electric Co.*, 45 Cal. App. 145 [187 Pac. 50]. These cases, however, were based upon facts radically different from those found in the case at bar, and are therefore of little aid. Reference to the essential facts of these cases will readily distinguish them from the instant case without comment. In the Brown case, *supra,* the syllabus concisely states the facts upon which a nonsuit was sustained, as follows: "The deceased, after approaching the car-track, and seeing the rapidly approaching car with its brilliant headlight, and after turning back to a place of safety, and hearing the warning whistle sounded by the motorman, suddenly, without looking, or taking any of the commonest precautions, rushed in front of the car." In the Ross case, *supra,* a nonsuit was affirmed on the following facts: Plaintiff was well acquainted with the locality where the accident occurred. It was broad daylight. She alighted from a car adjacent to a parallel track upon which another car was approaching from the opposite direction. The court said: "She had alighted . . . (in a) zone of safety,

from which . . . she had an unobstructed view for several hundred feet easterly, and from which point the slightest look or glance by her would have disclosed the proximity of the moving car which was such as to render it impossible for her to step forward without colliding therewith; and yet she, with full knowledge that the cars were accustomed to pass each other in the manner shown, . . . left the zone of safety, . . . and stepped so near the car then passing immediately in front of her, that she was struck by the projecting step.'' And in the Riney case, *supra*, a non-suit was affirmed in a case where plaintiff was injured at nearly the same place where the accident in the instant case occurred. In that case, however, the plaintiff crossed the railroad right of way from east to west, a distance of about forty feet, and without looking, stepped directly in front of a rapidly approaching car on the main track, which was plainly visible at a great distance. The court said : ''It is upon the second track that the plaintiff was injured. . . . The only time he looked or listened for an approaching car was when he left the sidewalk to cross the street. Although there was an open view for five hundred feet, and his hearing was good, he says he neither saw nor heard any indication of the approaching car. From that point until he was struck . . . he paid absolutely no further heed to his surroundings, but proceeded leisurely across the street apparently engrossed in introspective reflections. The distance he traveled was over forty feet, and he then entered upon the second track without looking up or even listening. At this time there was a car speeding down toward him . . . at a rate of thirty or forty miles per hour, upon an open unpaved track, with a noise . . . heard half a block away. . . . Considering the distance plaintiff had to travel from the curb, where he took his only observation of the street, to the second track where he was struck, the most obvious dictates of common prudence required him to look and listen again before entering on the second track.''

Appellant complains of error in the sustaining of objections to testimony to the effect that the public commonly crossed respondent's tracks, at the place where the accident occurred, in their course directly to Clubhouse Avenue on the westerly side of Trolley Way. ''Q. Is it (the right of way across the tracks to Clubhouse avenue)

ordinarily used by the public?'' Objections to similar questions were sustained. Unquestionably this evidence was competent to show a custom of pedestrians, the knowledge of which would throw some light upon the question as to whether appellant exercised reasonable caution in attempting to cross the tracks at that point. ██ Still, appellant is not harmed by this ruling as similar evidence upon this point was subsequently admitted, as hereinbefore mentioned.

For the foregoing reasons the judgment is reversed.

Hart, J., and Finch, P. J., concurred.